Collin Seals (SBN 249534)
**THE LAW OFFICES OF COLLIN SEALS**
790 E. Colorado Blvd., Suite 900
Pasadena, California 91101
Telephone: 626.240.0632
Facsimile: 626.240.0700
Email: collin.seals@seals-law.com

Attorney for Plaintiff
ALEXANDER SHAPIRO

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER SHAPIRO, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>NEW WAVE FOODS, INC, a Delaware Corporation; DOMINIQUE BARNES, an individual; MICHELLE WOLF, an individual; and DOES 1 to 100, inclusive,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF EMPLOYMENT CONTRACT**<br>2. **RELIGIOUS DISCRIMINATION (FEHA)**<br>3. **AGE DISCRIMINATION (FEHA)**<br>4. **SEXUAL ORIENTATION DISCRIMINATION(FEHA)**<br>5. **MARITAL STATUS DISCRIMINATION (FEHA)**<br>6. **FAILURE TO PREVENT RELIGIOUS DISCRIMINATION (FEHA)**<br>7. **FAILURE TO PREVENT AGE DISCRIMINATION (FEHA)**<br>8. **FAILURE TO PREENT SEXUAL ORIENTATION DISCRIMINATION (FEHA)**<br>9. **FAILURE TO PREENT MARITAL STATUS DISCRIMINATION (FEHA)**<br>10. **HARASSMENT (FEHA)**<br>11. **FAILURE TO PREVENT HARASSMENT (FEHA)**<br>12. **RETALIATION (FEHA)**<br>13. **WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**<br>14. **FRAUD** |

**COMPLAINT**

15. NEGLIGENT MISREPRESENTATION
16. BREACH OF FIDUCIARY DUTY
17. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
18. MONEY HAD AND RECEIVED
19. CONSTRUCTIVE TRUST
20. INCORRECT WAGE STATEMENTS
21. NONPAYMENT OF WAGES
22. WAITING TIME PENALTY
**JURY TRIAL DEMANDED**

Plaintiff Alexander Shapiro ("SHAPIRO"), by his attorney, alleges and states as follows:

## I.   INTRODUCTION AND BRIEF STATEMENT OF THE CASE

1.   This is an action for damages, statutory damages, exemplary/punitive damages, attorney fees and costs brought pursuant to California law.

2.   Defendants DOMINIQUE BARNES and MICHELLE WOLF – co-founders of Defendant NEW WAVE FOODS ("NEW WAVE") and its Chief Executive Officer and Chief Technical Officer, respectively – hired SHAPIRO in 2016 as NEW WAVE's Chief Marketing Officer and Chief Operating Officer.  In joining NEW WAVE, SHAPIRO left behind his long-term position at Del Monte Foods because he believed in NEW WAVE's future, and was excited by the prospect of joining a new company with an innovative product.  NEW WAVE made his decision easier by offering a substantial stake in the company, which would begin to fully vest after SHAPIRO spent one year at NEW WAVE.

3.   In June of 2017, NEW WAVE – through BARNES and WOLF – made SHAPIRO a further offer: if he would agree to defer $80,000 of his base salary, NEW WAVE would grant him an even greater stake in the company at the time his stock options vested.  SHAPIRO – still believing in the company and its future – happily agreed to this proposal.

**COMPLAINT**

4.     But NEW WAVE's offer was fraudulent, as BARNES, WOLF, and NEW WAVE had no intention of allowing SHAPIRO a share of the company.  Mere weeks before his shares were scheduled to vest, NEW WAVE and BARNES terminated SHAPIRO's employment.  NEW WAVE did not reimburse SHAPIRO for the true value of the shares, and did not even refund the deferred salary SHAPIRO agreed to in exchange for a larger equity stake.

5.     Although SHAPIRO's employment at NEW WAVE began as at-will, his acceptance of NEW WAVE's June, 2017, offer to increase his equity stake in exchange for deferring a portion of his salary changed that status, and created an implied-in-fact employment contract.  From that point, NEW WAVE could not terminate SHAPIRO's employment except for cause.

6.     Throughout his employment with NEW WAVE, SHAPIRO was subjected to discrimination and/or harassment as an older employee, as a Jew, as a homosexual, and as a single father.  Further, when SHAPIRO recognized troubling issues likely to subject NEW WAVE to legal action and/or government enforcement, and brought those issues to the attention of BARNES, WOLF, and NEW WAVE, he faced retaliation in the form of having his title and duties changed.

7.     NEW WAVE – through BARNES and WOLF – terminated SHAPIRO's employment on September 28, 2017.  This termination was wrongful, discriminatory, retaliatory, and a breach of Shapiro's implied-in-fact employment contract with NEW WAVE.  Further, NEW WAVE did not have cause to terminate SHAPIRO, because he had substantially performed his duties according to the terms of his contract.

8.     In the final analysis, BARNES and WOLF (on behalf of NEW WAVE) defrauded SHAPIRO by tricking him into deferring a portion of his salary in return for a promise NEW WAVE and BARNES never intended to keep.  They tossed SHAPIRO aside on the eve of his shares vesting, not only because they did not want to give SHAPIRO what they promised him, but also because they disapproved

of his sexual orientation, his ethnicity and religion, his marital status, and his dedication to ensuring NEW WAVE acted legally, ethically, and responsibly.

## II.   JURISDICTION AND VENUE

9.    This court has jurisdiction pursuant to 28 U.S.C. § 1332(a).  Shapiro is a resident and citizen of Massachusetts, while Defendants are all citizens of California and/or Delaware.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## III.   PARTIES

10.   Plaintiff ALEXANDER SHAPIRO is a natural person now residing in the state of Massachusetts. At all times relevant to this Complaint, SHAPIRO was a citizen of the state of California, residing in the county of San Francisco.  From November 10, 2016, to September 28, 2017, SHAPIRO was employed by Defendant NEW WAVE FOODS.

11.   Defendant NEW WAVE FOODS, INC., is a corporation organized under the laws of the state of Delaware, and having its principal place of business in San Francisco, California.

12.   Defendant DOMINIQUE BARNES is an individual who Plaintiff is informed and believes and on that basis alleges works in San Francisco, California, and lives in Alameda County, California.

13.   Defendant MICHELLE WOLF is an individual who Plaintiff is informed and believes and on that basis alleges lives and works in San Francisco, California.

14.   Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 to 100, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner to plaintiff as hereinafter alleged, and that plaintiff's damages as herein alleged were proximately caused by their conduct.

15.   Plaintiff is informed and believes and on that basis alleges that each of the above-named Defendants was at all relevant times an agent for each other Defendant with respect to the allegations contained herein.

## IV.   FACTUAL ALLEGATIONS

16.   Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to a plaintiff himself, which Plaintiff alleges on personal knowledge.

### A. Background – Alexander Shapiro:

17.   ALEXANDER SHAPIRO is a 1988 graduate of Yale University, and moved to the San Francisco area in October of 1988, and from 1988 to 1996 worked in Human Resources, while also serving in leadership roles in various local community organizations.  From 1996 to 1998, SHAPIRO attended the Haas School of Business at the University of California at Berkeley, graduating with an MBA and a certificate in Global Management, and serving in leadership positions for multiple student groups.  After obtaining his MBA, SHAPIRO chose to stay in California and begin his career with the Clorox Company, rising to increasingly responsible roles and ultimately becoming a brand manager.

18.   After leaving Clorox in 2001, SHAPIRO worked for a time for a Hallmark subsidiary – The Picture People – and also founded Not Your Granny's Jam LLC, a fruit preserves company, which started his interest in the food business.  Following this interest, SHAPIRO went to work for Del Monte Foods, Inc., in  2005, and again rose through the marketing and business development ranks.

19.   By 2016, SHAPIRO had risen to the position of Director of Marketing at Del Monte Foods, Inc.  As a Director, SHAPIRO commercialized new product lines, and was responsible for all facets of the business of those product lines, including but not limited to operational logistics, marketing, sales, and profit and loss financial results.

20.   As his career progressed and his responsibilities grew, SHAPIRO began to feel the pull of different responsibilities — he wanted to become a father, and raise a child.  The fact he was not in a relationship did not deter him, because he was raised by a single mother who maintained a career of her own throughout his childhood.  He knew it could be done, so in 2008, working with Adoption Connection – a Jewish family and children's services agency – he adopted a four-year-old Jewish boy from Southern California.

21.   Fatherhood re-connected SHAPIRO to his Jewish cultural heritage.  He began regularly attending Temple and Hebrew School with his son, and volunteered cooking and delivering meals for homeless shelters as part of the Temple's community programs.  Ultimately, in 2016, SHAPIRO studied for and completed his Bar Mitzvah on the eve of his 50th birthday, confirming to himself and to his son the importance of his heritage.

**B. Alexander Shapiro Joins New Wave Foods:**

22.   Also in 2016, a recruiter SHAPIRO had worked with in the past approached him with an interesting prospect — an interesting food business start-up was looking for its first outside hire.  The job was described as both Chief Operating Officer and Chief Marketing Officer, and the company was NEW WAVE. Although happy at Del Monte, SHAPIRO agreed to meet with NEW WAVE and its co-founders, WOLF and BARNES.

23.   Over the course of several interviews, SHAPIRO became intrigued by NEW WAVE's product – plant-based seafood – and the passion, commitment, and intelligence of both BARNES and WOLF.  SHAPIRO also recognized BARNES and WOLF were inexperienced in the operational and logistical aspects of running a business, so he believed he could use his skills and experience to make an immediate positive impact and benefit the company.  NEW WAVE had not yet begun production, did not have a distribution network or a manufacturing pipeline — it was at this point little more than a lab-developed fried shrimp substitute

**COMPLAINT**

prototype, a few hundred thousand dollars from an underperforming seed financing round, and two bright co-founders.

24. NEW WAVE offered SHAPIRO the position at $160,000 per year, with no additional benefits and no bonus structure. This made SHAPIRO apprehensive, given his long tenure at Del Monte, where he was paid over $30,000 more per year in base salary alone, with generous benefits and bonuses. With his son's welfare and future to consider, SHAPIRO found it hard to justify accepting NEW WAVE's offer, despite the exciting product and challenges it presented.

25. In order to entice SHAPIRO to join, NEW WAVE offered SHAPIRO a 5% equity stake in the company through a Restricted Stock Purchase Agreement. For a minimal initial outlay of $462.99, SHAPIRO would secure his right to this equity stake, so long as he stayed with NEW WAVE for one year.

26. SHAPIRO ultimately chose to join NEW WAVE despite the lack of benefits, despite the lack of bonuses, and despite the substantially lower salary, based on this offer of a 5% equity stake in the company. He signed the Restricted Stock Purchase Agreement, paid his $462.99 to secure his rights, and set his mind towards making an immediate positive impact and positioning NEW WAVE for the future.

27. And he did make an impact. Focusing initially on finance and operations, SHAPIRO established financial norms for the company, brought on a temporary Chief Financial Officer to oversee the finances, set up a 3-5 year plan to get NEW WAVE much needed capital, implemented actionable goals for himself and his colleagues, and got production underway.

28. At the time of his hiring, NEW WAVE's one product was a fully cooked, breaded vegan "shrimp." SHAPIRO recognized this product – while ingenious – would prove difficult to sell to food service operators, for whom a fully cooked item was impractical as it would be heated through a second time during preparation, resulting in overcooking. With the insight built from years in the business, SHAPIRO pushed NEW WAVE to launch four product lines rather than

**COMPLAINT**

1   one — the original fully breaded and cooked version, a partially cooked (or "par"

2   cooked) breaded version, a raw version, and a par cooked raw version.  Later, it

3   became clear customers preferred the "raw" versions, which dramatically improved

4   sales and confirmed SHAPIRO's foresight, market knowledge, and the value of his

5   industry experience.

6   29.   As part of his plan to get NEW WAVE more operating capital, SHAPIRO

7   revamped the fundraising structure.  In its seed financing round prior to

8   SHAPIRO's hire, NEW WAVE had raised only $780,000 on a $2-million note, a

9   disappointing result he did not want to see repeated.  He was also concerned with

10  the results of meetings BARNES led or held on her own.  For example, in a

11  meeting BARNES arranged with a female-led venture capital group focusing on

12  consumer packaged goods – precisely the audience most likely to be receptive to a

13  female-led food-based startup – BARNES ended up with $0 pledged capital.

14  30.   Concerned about these obvious problems in attracting capital investment,

15  SHAPIRO focused on researching appropriate investors and training BARNES and

16  particularly WOLF in presenting NEW WAVE's ideas and strategy to investors.

17  SHAPIRO led a trip to New York where he organized and oversaw a successful

18  open house event, and – with WOLF – took meetings designed to improve and

19  boost the flavor of NEW WAVE's product, making it more marketable.

20  31.   In addition to his dual roles as COO and CMO, SHAPIRO also jumped in as

21  effective Chief Financial Officer.  In that capacity, he overhauled NEW WAVE's

22  Quickbooks, fixed incorrect coding, worked with outside finance personnel, and

23  identified other errors to be corrected.

24  32.   Although SHAPIRO was overhauling the financing, BARNES decided to get

25  involved in the process, even though she had no financial background.  BARNES

26  informed SHAPIRO she was already working on finances, and on her own

27  initiative offered a stock-only option to an acquaintance purportedly knowledgeable

28  in the financial area.  BARNES then expressly "uninvited" SHAPIRO to work with

- 8 -

**COMPLAINT**

1   BARNES' acquaintance, even though BARNES' acquaintance did not have the

2   requisite knowledge or skills to improve NEW WAVE's financial prospects.

3   33.   This treatment shocked SHAPIRO and appeared to shock WOLF, who had

4   worked with SHAPIRO on the costing system for inventory management.

5   34.   In this fashion, SHAPIRO set NEW WAVE on the road to success.  Despite

6   BARNES' interference, and despite the obstacles thrown in his path, SHAPIRO

7   still pushed forward because he believed in the company and its ultimate potential.

8   **C. Shapiro Subjected to Discrimination:**

9   35.   Despite his excitement over NEW WAVE's potential, SHAPIRO soon began

10   to recognize discriminatory behavior aimed at him.

11   36.   It became apparent that BARNES in particular harbored a degree of

12   animosity towards Jewish people such as SHAPIRO.  During meetings and in other

13   business environments, BARNES would often adopt a stereotypical "Jewish"

14   accent in dealings with SHAPIRO, particularly in saying SHAPIRO's full name in

15   this exaggerated manner.  These incidents would increase at times when BARNES

16   felt the need to deal with a predominantly Jewish crowd, such as in the lead-up to a

17   customer pitch in Las Vegas in April 2017, or in Kosher customer meetings (an

18   important part of NEW WAVE's marketing strategy), or when dealing with the

19   Orthodox Union, the global Kosher certification agency SHAPIRO contracted on

20   behalf of NEW WAVE.

21   37.   These incidents hurt SHAPIRO and caused him great concern that BARNES

22   and NEW WAVE were stereotyping him as well, and that his religion and heritage

23   made him a target.  His apprehension increased when he heard BARNES speak

24   negatively about people from other ethnic groups as well, including speaking in a

25   negative manner about one of her own relatives by marriage, a Hispanic woman.

26   38.   NEW WAVE's hiring practices followed BARNES' preferences, and NEW

27   WAVE hired – for example – persons from conservative Christian colleges when

28   other, more qualified individuals were available.

39.   These incidents distressed and hurt SHAPIRO at a time when he was most connected with his Jewish heritage, having just had his Bar Mitzvah and focusing on raising his son in the faith.  Still, SHAPIRO felt he could do nothing or say nothing, at least until his shares vested, because as he understood it he was an at-will employee and so did not want to make waves at a time when he was intent on building the company.

40.   Further, although the hurtful and discriminatory communications came primarily from BARNES, NEW WAVE's Chief Executive Officer, SHAPIRO recognized that WOLF was present for most of these exchanges.  Although WOLF appeared disturbed by BARNES' behavior and the effect it had on SHAPIRO, he noted that WOLF did not speak out on his behalf or appear to do anything to mitigate BARNES' discriminatory language.  SHAPIRO concluded that if WOLF felt unable to speak up as a joint owner of NEW WAVE (and its highest ranking officer after BARNES), then SHAPIRO would certainly face negative repercussions if he raised an objection.

41.   Compounding concerns about his status at NEW WAVE, SHAPIRO also recognized BARNES' and WOLF's mistrust of older people, particularly older people within the business world.  "Old" was the first descriptive term used when describing anyone more than a decade or so older than themselves, and was always used in a pejorative sense.  NEW WAVE's lawyer was always referred to as an "old" lawyer, the temporary CFO SHAPIRO brought in was "old and rigid," the recruiters who brought SHAPIRO into the company were "old and annoying." Following SHAPIRO, the new employees were almost all around the same age as BARNES and WOLF, and SHAPIRO noticed that BARNES in particular was uncomfortable dealing on a professional level with older people — even investors whose money NEW WAVE desperately needed.  Because he was over 50, SHAPIRO grew concerned his age made him a target as well, particularly as it appeared BARNES and WOLF did not trust older employees, were uncomfortable

**COMPLAINT**

being the boss of older employees, did not respect the skill and experience of older employees, and would prefer that all their employees were of a similar age as themselves, if not younger.

42.   As with BARNES' hurtful anti-Semitic comments, SHAPIRO felt he could not complain about these comments until his shares vested.  Instead, he focused his energies on his work, although the comments haunted him.

43.   Finally, SHAPIRO faced criticism and harassment due to his sexuality and the associated marital status that accompanied it.  SHAPIRO is a gay man raising a son without a partner, which often brought him into conflict with WOLF and BARNES, which hurt SHAPIRO.

44.   As a single parent, SHAPIRO was often required to deal with issues related to his son's school or extracurricular activities.  When this happened, it could lead to him arriving at NEW WAVE's offices slightly after his usual arrival time of 9:00am.  Most days, SHAPIRO and WOLF would carpool to the office, and when these issues made them even a few minutes late, BARNES would become enraged — even though SHAPIRO understood he was not an hourly employee (and therefore not required to clock in at a precise time), and even though the minor delays did not affect SHAPIRO's work in any way.  BARNES had no understanding of the demands placed on a single parent, and therefore blamed SHAPIRO for allowing those demands to slightly affect the timing of his arrival at the office, even though it did not affect either SHAPIRO's or WOLF's work.

45.   NEW WAVE did not have anti-harassment or anti-discrimination policies in place during SHAPIRO's employment.  Further, there was no complaint mechanism or procedure for reporting, investigating, or dealing with discrimination or harassment, and no instructions to supervisors regarding the handling of such complaints.  And SHAPIRO was actively prevented from using alternative means for reporting or raising concerns to others, as he was specifically warned against contacting NEW WAVE Advisors, the de facto board of the company.

**COMPLAINT**

**D. NEW WAVE Offers to Increase SHAPIRO's Equity Stake:**

46.   As noted above, a large part of SHAPIRO's decision to join NEW WAVE was the offer of a substantial equity stake, amounting to 5% of the company when the shares vested.  Upon joining NEW WAVE, SHAPIRO executed a Restricted Stock Purchase Agreement whereby he pre-paid for nearly 500,000 shares of NEW WAVE stock at $0.001 per share, thus securing his rights to those shares.

47.   Pursuant to the Restricted Stock Purchase Agreement, the shares would vest in stages.  The first stage would occur on November 7, 2017, when one quarter of the purchased shares would vest.  The remaining shares would vest in regular monthly intervals for the next 36 months.

48.   As with most stock purchase agreements, SHAPIRO's came with conditions. The most relevant condition for present purposes was that for the shares to fully vest, SHAPIRO would have to remain employed by NEW WAVE.  If he was terminated, NEW WAVE could purchase the rights to the unvested shares at the price he paid — $0.001 per share.

49.   In June of 2017, BARNES and WOLF – on behalf of NEW WAVE – approached SHAPIRO with an offer: in exchange for deferring a portion of his salary, NEW WAVE would grant SHAPIRO an additional 1% of the company through a second Restricted Stock Purchase Agreement, bringing his equity stake up to 6% once all shares vested.  As explained by BARNES and WOLF, the deferral would be short, until the end of 2017 or at the outside when NEW WAVE closed its Series A round.  At the end of the deferral period, SHAPIRO's salary would be restored to $120,000 ($40,000 below its previous level) and he would also receive the entire deferred portion of his salary.

50.   This offer would lower his immediate take-home pay by $80,000 per year, but SHAPIRO accepted, not only to help NEW WAVE cut costs but also for the opportunity to increase his equity stake in the company he still believed in, and where he hoped to spend the remainder of his career.

THE LAW OFFICES OF
COLLIN SEALS

**COMPLAINT**

**E. Despite Obstacles, SHAPIRO Builds NEW WAVE Operations and Positions NEW WAVE for the Future:**

51.   In order to build a future for NEW WAVE, increase the value of his equity position, and simply perform the duties required of his job, SHAPIRO continued to work hard throughout the summer of 2017 to build NEW WAVE's operations and marketing, and did his best to ignore the hurtful and discriminatory comments from NEW WAVE's leadership.

52.   One overarching problem facing NEW WAVE at this time was the lack of a sellable product in sufficient quantity for the launch, which hampered SHAPIRO's efforts to strike deals with distribution networks.  Still, he was able to secure important contracts with companies such as the University of California, Berkeley student dining; Veestro (a vegan home meal delivery service); and Orchard Grocer in New York City.  When NEW WAVE finally produced sellable products in July 2017, SHAPIRO was able to begin increasing the distribution network.

53.   In anticipation of having a sellable product, SHAPIRO worked with WOLF on setting up NEW WAVE's production and marketing network.  SHAPIRO brought aboard a former engineering colleague from his time at Del Monte to be NEW WAVE's product and process engineer, and together they worked on improving the NEW WAVE's throughput and manufacturing efficiency. SHAPIRO researched manufacturing equipment to fit NEW WAVE's needs, and NEW WAVE eventually purchased the machine SHAPIRO researched and identified.  SHAPIRO also built relationships with the co-manufacturers needed to bring NEW WAVE's products to market.

54.   Another great problem hampering NEW WAVE at this time was BARNES herself, who appeared disinterested in performing the expected duties of a Chief Executive Officer.  She did not want to attend or participate in team or even one-on-one meetings; could not raise money and was dismissive of the need to do so, and contemptuous of those who were able to do so; and focused nearly all of her

energies on securing speaking engagements to talk on topics such as the need to save the oceans, and worked more diligently to meet marine biologist and author Sylvia Earle than she did to raise the funds to keep NEW WAVE going.

55.   For example, during the trip to New York mentioned above, SHAPIRO and WOLF arranged a meeting with the United States head of business for Firmenich, one of the top fragrance and flavor companies in the world. Also attending the meeting were multiple key researchers, and the goal was to develop a better and more realistic taste for NEW WAVE's raw and breaded vegan shrimp offerings. Although NEW WAVE was a startup without much operating capital, due to SHAPIRO's efforts Firmenich agreed to meet for a full day, so as the better work through NEW WAVE's issues and present workable solutions.  It was a key, important meeting for NEW WAVE's future success, but at the last minute BARNES backed out without explanation, leaving SHAPIRO to cover the meeting with WOLF, and leaving SHAPIRO to take care of all the follow-up.

56.   SHAPIRO also built NEW WAVE's relationship with Kiki Adami, founder of a vegan restaurant consulting business in New York.  Adami had tried contacting BARNES to build a business relationship, but BARNES had not returned Adami's calls or emails.  When he learned of this, SHAPIRO contacted Adami and began the professional relationship with her, including at the open house in New York, mentioned above.  Through Adami, SHAPIRO and NEW WAVE were able to build a relationship with Ace Natural Foods, which currently sells NEW WAVE's products on the East Coast (and Ms. Adami is a NEW WAVE representative).

57.   When BARNES did focus on business issues, her demands were confusing and often counterproductive, creating difficulties for SHAPIRO in building NEW WAVE's supply.

58.   Because BARNES abdicated her responsibilities, SHAPIRO stepped in to take up much of the slack.  When NEW WAVE was accepted to an incubator backed by the World Wildlife Fund, BARNES did no work, forcing SHAPIRO to

THE LAW OFFICES OF
COLLIN SEALS

**COMPLAINT**

step in and do BARNES' work for her, and make excuses for her as well.  WWF was frustrated at BARNES' disinterest, and informed SHAPIRO that in order for NEW WAVE to succeed, BARNES would have to learn to run it as a business, or else defer to people who knew and understood running a business.

59.   In this way and others, SHAPIRO overcame great obstacles and positioned NEW WAVE for future success.

**F.  September 28, 2017 – New Wave Fires Shapiro Without Cause:**

60.   But NEW WAVE and its founders – BARNES and WOLF – were not content to let SHAPIRO take a substantial share of the company, even though it had been promised to him and even though SHAPIRO's work increased the value of the company and BARNES' and WOLF's own shares.  Therefore, despite SHAPIRO's dedication and hard work, despite his substantial and much needed experience in the food industry, despite his knowledge of operational logistics and marketing, and despite his victories in positioning NEW WAVE for success, BARNES and WOLF – on behalf of NEW WAVE – fired SHAPIRO on September 28, 2017, only a few short weeks before the first (and largest) group of his stock would fully vest. BARNES, WOLF, and NEW WAVE offered no severance of any kind.

61.   NEW WAVE purported to dismiss SHAPIRO for cause, stating in his termination letter: "You have not successfully executed the duties for which you were hired. As our business depends on the efficiency and effectiveness of our work force, we have decided to terminate your employment."

62.   The reason stated in the termination letter was false, as SHAPIRO had in fact substantially performed his duties and shown good performance.  Other than this vague statement in the termination letter, SHAPIRO was given no explanation for his termination, no forewarning, and no official performance review or plan of correction at any time prior to his termination.

63.   SHAPIRO did not sign any severance agreement or other waiver of rights.

64.   As reflected in NEW WAVE's termination letter, NEW WAVE did not pay all of SHAPIRO's wages due and owing to him on the date of his dismissal, because NEW WAVE did not deposit SHAPIRO's final pay check on that date.

65.   Thirteen days later, on October 11, 2017, NEW WAVE issued a cashier's check in the amount of $462.99, the sum SHAPIRO had paid to secure his right to his equity stake in NEW WAVE.  To add insult to injury, NEW WAVE did not reimburse SHAPIRO for the wages he deferred in order to secure an additional equity stake in the company.

66.   Following SHAPIRO's termination, BARNES and WOLF hired two people to perform the duties SHAPIRO had performed on his own.  Both of these employees were significantly younger than SHAPIRO, considerably less experienced than SHAPIRO, and on information and belief SHAPIRO alleges both were younger than 40 years of age, and not homosexual or Jewish.

67.   On August 10, 2018, SHAPIRO – through his counsel – requested his employment and payroll files pursuant to California Labor Code §§ 226, 432, 1198.5, and 6408.  On August 20, 2018, NEW WAVE provided documents which it purported to be all documents responsive to this request.

68.   The documents NEW WAVE provided were deficient in several respects, including but not limited to the fact that SHAPIRO was identified in his payroll files as working a specified number of hours per pay period, and the hours recorded would have entitled SHAPIRO to substantial overtime for each week he worked at NEW WAVE.

69.   On September 20, 2018, SHAPIRO – through his attorney – obtained a "Right-to-Sue" letter from the California Department of Fair Employment and Housing ("DFEH") regarding the matters set forth herein.  SHAPIRO has thus timely complied with the exhaustion requirements of California's Fair Employment and Housing Act ("FEHA").

# FIRST CLAIM FOR RELIEF

## Breach of Employment Contract

(*Against All Defendants*)

70.     The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

71.     At all relevant times, Plaintiff SHAPIRO was employed by Defendant NEW WAVE, which was owned and controlled by Defendants BARNES and WOLF.

72.     When hired, Plaintiff SHAPIRO understood he was an "at-will" employee.  But in June of 2017, NEW WAVE – through BARNES and WOLF – made an offer to SHAPIRO.  If SHAPIRO would agree to defer a substantial part of his salary, BARNES and WOLF promised that NEW WAVE would allow SHAPIRO to increase his equity stake in the company by an additional 1%, to a total of 6%.

73.     When SHAPIRO agreed to NEW WAVE's proposal – made through BARNES and WOLF – he was no longer an "at-will" employee.  His agreement and the consideration he provided created an implied in fact contract whereby – among other things –NEW WAVE was obligated to ensure SHAPIRO's continued employment until such time as all of his equity stake would fully vest, and NEW WAVE could only terminate his employment for just cause.

74.     NEW WAVE did not have just cause to terminate SHAPIRO's employment only weeks before the first group of his shares would fully vest.  SHAPIRO substantially performed the duties of his job, and in fact performed necessary duties abdicated by BARNES and WOLF.  To the extent any duties specific to his job were not performed, such performance was excused in that he was prevented from performing such duties by reason of – among other things – direct orders from BARNES and/or WOLF.

75.     Defendants terminated SHAPIRO, without good cause, on September 28, 2017. Defendants did not counsel SHAPIRO, did not notify SHAPIRO of any deficiencies in his job performance, did not give him an opportunity to rectify any purported issues, and did not offer him a severance package befitting his title and seniority.

THE LAW OFFICES OF
COLLIN SEALS

**COMPLAINT**

76.    SHAPIRO was harmed by the discharge as described herein, including but not limited to being deprived of his salary, his negotiated stake in NEW WAVE, and the amount of salary he deferred in order to secure his increased stake.

## SECOND CLAIM FOR RELIEF

### Religious Discrimination in Violation of the California

### Fair Employment & Housing Act ("FEHA")(Cal. Govt. Code § 12940(a))

(*Against All Defendants*)

77.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

78.    At all relevant times, SHAPIRO was an employee of NEW WAVE.

79.    NEW WAVE is a California employer subject to the statutory requirements of the California Fair Employment & Housing Act (FEHA).

80.    SHAPIRO has sincerely held religious beliefs.  He is a practicing Jew who regularly attends Temple, was raised in the Jewish faith and is raising his son in the faith as well.

81.    Throughout his employment at NEW WAVE, SHAPIRO faced a pattern of numerous adverse employment actions, including but not limited to reduction in his job duties and responsibilities and changes in his title.

82.    On September 28, 2017, NEW WAVE – through BARNES and WOLF – subjected SHAPIRO to a further adverse employment action — that is, they terminated SHAPIRO's employment at NEW WAVE.

83.    The fact that SHAPIRO is Jewish was a substantial motivating reason for each adverse employment actions SHAPIRO faced throughout his employment at NEW WAVE.

84.    As a direct result of Defendants' conduct as described herein, SHAPIRO was harmed by – among other things, the loss of his duties and titles, the loss of his job, the loss of his agreed-upon equity stake in NEW WAVE, the loss of the salary he deferred to increase his equity stake in NEW WAVE, and the diminishment of his

**COMPLAINT**

professional reputation.

## **THIRD CLAIM FOR RELIEF**

### **Age Discrimination in Violation of FEHA**

### **(Cal. Govt. Code § 12940(a))**

(*Against All Defendants*)

85.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

86.   At all relevant times, SHAPIRO was an employee of NEW WAVE.

87.   NEW WAVE is a California employer subject to FEHA's statutory requirements.

88.   SHAPIRO was over 40 years of age throughout his employment at NEW WAVE.

89.   Throughout his employment at NEW WAVE, SHAPIRO faced a pattern of numerous adverse employment actions, including but not limited to reduction in his job duties and responsibilities and changes in his title.

90.   On September 28, 2017, NEW WAVE – through BARNES and WOLF – subjected SHAPIRO to a further adverse employment action — that is, they terminated SHAPIRO's employment at NEW WAVE.

91.   SHAPIRO's age was a substantial motivating reason for each adverse employment action SHAPIRO faced throughout his employment at NEW WAVE.

92.   As a direct result of Defendants' conduct as described herein, SHAPIRO was harmed by – among other things, the loss of his duties and titles, the loss of his job, the loss of his agreed-upon equity stake in NEW WAVE, the loss of the salary he deferred to increase his equity stake in NEW WAVE, and the diminishment of his professional reputation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FOURTH CLAIM FOR RELIEF

## Sexual Orientation Discrimination in Violation of FEHA

## (Cal. Govt. Code § 12940(a))

(*Against All Defendants*)

93.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

94.   At all relevant times, SHAPIRO was an employee of NEW WAVE.

95.   NEW WAVE is a California employer subject to FEHA's statutory requirements.

96.   Throughout his employment at NEW WAVE, SHAPIRO faced a pattern of numerous adverse employment actions, including but not limited to reduction in his job duties and responsibilities and changes in his title.

97.   On September 28, 2017, NEW WAVE – through BARNES and WOLF – subjected SHAPIRO to a further adverse employment action — that is, they terminated SHAPIRO's employment at NEW WAVE.

98.   The fact that SHAPIRO is homosexual was a substantial motivating reason for each adverse employment actions SHAPIRO faced throughout his employment at NEW WAVE.

99.   As a direct result of Defendants' conduct as described herein, SHAPIRO was harmed by – among other things, the loss of his duties and titles, the loss of his job, the loss of his agreed-upon equity stake in NEW WAVE, the loss of the salary he deferred to increase his equity stake in NEW WAVE, and the diminishment of his professional reputation.

1

2

3

4

## **FIFTH CLAIM FOR RELIEF**

### **Marital Status Discrimination in Violation of FEHA**

### **(Cal. Govt. Code § 12940(a))**

(*Against All Defendants*)

5   100. The allegations of each of the preceding paragraphs are realleged and

6   incorporated herein by reference.

7   101. At all relevant times, SHAPIRO was an employee of NEW WAVE.

8   102. NEW WAVE is a California employer subject to FEHA's statutory

9   requirements.

10  103. Throughout his employment at NEW WAVE, SHAPIRO faced a pattern of

11  numerous adverse employment actions, including but not limited to reduction in his

12  job duties and responsibilities and changes in his title.

13  104. On September 28, 2017, NEW WAVE – through BARNES and WOLF –

14  subjected SHAPIRO to a further adverse employment action — that is, they

15  terminated SHAPIRO's employment at NEW WAVE.

16  105. The fact that SHAPIRO is a single parent raising his adopted son alone was a

17  substantial motivating reason for each adverse employment action SHAPIRO faced

18  throughout his employment at NEW WAVE.

19  106. As a direct result of Defendants' conduct as described herein, SHAPIRO was

20  harmed by – among other things, the loss of his duties and titles, the loss of his job,

21  the loss of his agreed-upon equity stake in NEW WAVE, the loss of the salary he

22  deferred to increase his equity stake in NEW WAVE, and the diminishment of his

23  professional reputation.

24

25

26

27

28

## SIXTH CLAIM FOR RELIEF

### Failure to Prevent Religious Discrimination (Cal. Govt. Code §12940(m))

*(Against All Defendants)*

107. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

108. At all relevant times, SHAPIRO was an employee of NEW WAVE.

109. NEW WAVE is a California employer subject to FEHA's statutory requirements.

110. As noted above, SHAPIRO was subjected to discrimination throughout his tenure at NEW WAVE, because of his Jewish heritage and religion, as described above.  He was subjected to ridicule and harassment, and faced adverse employment actions, including but not limited to having his duties and responsibilities reduced as a result of BARNES and WOLF's mistrust of his Jewish faith, and the termination of his employment on September 28, 2017.

111. Defendants failed to take all reasonable steps to prevent SHAPIRO from being harassed for his religion and heritage.  Defendants failed to create or promulgate any anti-harassment or anti-discrimination policies, failed to put in place a complaint mechanism or procedure for reporting, investigating, or dealing with discrimination or harassment, gave no instructions to employees regarding the handling of such complaints, and did not attend any presentations regarding harassment and discrimination in the workplace.

112. Instead of halting the discrimination and harassment, or preventing the discrimination and/or harassment from happening, or happening further, Defendants – and each of them – did nothing.

113. As a result of Defendants' failure to prevent discrimination, SHAPIRO was damaged including but not limited to the adverse employment action he suffered at Defendants' hands, the loss of the salary he deferred in exchange for an additional ownership percentage of NEW WAVE, the loss of all of his ownership stake in

**COMPLAINT**

NEW WAVE, harm to his professional reputation, and mental anguish.

## SEVENTH CLAIM FOR RELIEF

### Failure to Prevent Age Discrimination (Cal. Govt. Code §12940(m))

(*Against All Defendants*)

114. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

115. At all relevant times, SHAPIRO was an employee of NEW WAVE.

116. NEW WAVE is a California employer subject to FEHA's statutory requirements.

117. As noted above, SHAPIRO was subjected to discrimination throughout his tenure at NEW WAVE, because of his age, as described above.  He was subjected to ridicule and harassment, and faced adverse employment actions, including but not limited to having his duties and responsibilities reduced as a result of BARNES and WOLF's mistrust of older employees and older persons generally.  Ultimately, on September 28, 2017, NEW WAVE – through BARNES and WOLF – terminated SHAPIRO's employment at NEW WAVE.

118. Defendants failed to take all reasonable steps to prevent SHAPIRO from being harassed for his religion and heritage.  Defendants failed to create or promulgate any anti-harassment or anti-discrimination policies, failed to put in place a complaint mechanism or procedure for reporting, investigating, or dealing with discrimination or harassment, gave no instructions to employees regarding the handling of such complaints, and did not attend any presentations regarding harassment and discrimination in the workplace.

119. Instead of halting the discrimination and harassment, or preventing the discrimination and/or harassment from happening, or happening further, Defendants – and each of them – did nothing.

120. As a result of Defendants' failure to prevent discrimination, SHAPIRO was damaged including but not limited to the adverse employment action he suffered at

The Law Offices Of
Collin Seals

Defendants' hands, the loss of the salary he deferred in exchange for an additional ownership percentage of NEW WAVE, the loss of all of his ownership stake in NEW WAVE, harm to his professional reputation, and mental anguish.

## EIGHTH CLAIM FOR RELIEF

### Failure to Prevent Sexual Orientation Discrimination

### (Cal. Govt. Code §12940(m))

(*Against All Defendants*)

121. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

122. At all relevant times, SHAPIRO was an employee of NEW WAVE.

123. NEW WAVE is a California employer subject to FEHA's statutory requirements.

124. As noted above, SHAPIRO was subjected to discrimination throughout his tenure at NEW WAVE, because he is homosexual, as described above.  He was subjected to ridicule and harassment, and faced adverse employment actions, including but not limited to having his duties and responsibilities reduced as a result of BARNES and WOLF's opinions regarding gay men.  Ultimately, on September 28, 2017, NEW WAVE – through BARNES and WOLF – terminated SHAPIRO's employment at NEW WAVE.

125. Defendants failed to take all reasonable steps to prevent SHAPIRO from being harassed for his sexual orientation.  Defendants failed to create or promulgate any anti-harassment or anti-discrimination policies, failed to put in place a complaint mechanism or procedure for reporting, investigating, or dealing with discrimination or harassment, gave no instructions to employees regarding the handling of such complaints, and did not attend any presentations regarding harassment and discrimination in the workplace.

126. Instead of halting the discrimination and harassment, or preventing the discrimination and/or harassment from happening, or happening further,

THE LAW OFFICES OF
COLLIN SEALS

**COMPLAINT**

1  Defendants – and each of them – did nothing.

2  127. As a result of Defendants' failure to prevent discrimination, SHAPIRO was

3  damaged including but not limited to the adverse employment action he suffered at

4  Defendants' hands, the loss of the salary he deferred in exchange for an additional

5  ownership percentage of NEW WAVE, the loss of all of his ownership stake in

6  NEW WAVE, harm to his professional reputation, and mental anguish.

7  **NINTH CLAIM FOR RELIEF**

8  **Failure to Prevent Marital Status Discrimination**

9  **(Cal. Govt. Code §12940(m))**

10  (*Against All Defendants*)

11  128. The allegations of each of the preceding paragraphs are realleged and

12  incorporated herein by reference.

13  129. At all relevant times, SHAPIRO was an employee of NEW WAVE.

14  130. NEW WAVE is a California employer subject to FEHA's statutory

15  requirements.

16  131. As noted above, SHAPIRO was subjected to discrimination throughout his

17  tenure at NEW WAVE, because he is a single father, as described above.  He was

18  subjected to ridicule and harassment, and faced adverse employment actions,

19  including but not limited to having his duties and responsibilities reduced as a result

20  of BARNES and WOLF's inability and/or unwillingness to accommodate single

21  parents.

22  132. Ultimately, on September 28, 2017, NEW WAVE – through BARNES and

23  WOLF – terminated SHAPIRO's employment at NEW WAVE.

24  133. Defendants failed to take all reasonable steps to prevent SHAPIRO from

25  being harassed for his marital status.  Defendants failed to create or promulgate any

26  anti-harassment or anti-discrimination policies, failed to put in place a complaint

27  mechanism or procedure for reporting, investigating, or dealing with discrimination

28  or harassment, gave no instructions to employees regarding the handling of such

complaints, and did not attend any presentations regarding harassment and discrimination in the workplace.

134. Instead of halting the discrimination and harassment, or preventing the discrimination and/or harassment from happening, or happening further, Defendants – and each of them – did nothing.

135. As a result of Defendants' failure to prevent discrimination, SHAPIRO was damaged including but not limited to the adverse employment action he suffered at Defendants' hands, the loss of the salary he deferred in exchange for an additional ownership percentage of NEW WAVE, the loss of all of his ownership stake in NEW WAVE, harm to his professional reputation, and mental anguish.

## TENTH CLAIM FOR RELIEF

### Harassment In Violation of FEHA (California Govt. Code § 12940(j))

(*Against All Defendants*)

136. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

137. At all relevant times, SHAPIRO was an employee of NEW WAVE.

138. NEW WAVE is a California employer subject to FEHA's statutory requirements.

139. SHAPIRO was subjected to harassment throughout his tenure at NEW WAVE, because of his age, his religion, his sexual orientation, and his status as a single father, as described above.  This harassing conduct was severe and pervasive, such that a reasonable person in SHAPIRO's position would have considered the work environment at NEW WAVE hostile and/or abusive, and SHAPIRO himself considered the environment hostile and/or abusive.

140. Defendants – and each of them – participated in and/or encouraged the harassing conduct.

141. SHAPIRO was harmed by Defendants' actions and harassment.

## ELEVENTH CLAIM FOR RELIEF

### Failure to Prevent Harassment in Violation of FEHA

### (Cal. Govt. Code § 12940(k))

(*Against All Defendants*)

142. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

143. At all relevant times, SHAPIRO was an employee of NEW WAVE.

144. NEW WAVE is a California employer subject to FEHA's statutory requirements.

145. SHAPIRO was subjected to harassment throughout his tenure at NEW WAVE, because of his age, his religion, his sexual orientation, and his status as a single father, as described above.

146. Defendants – and each of them – failed to take all necessary steps to prevent SHAPIRO from being harassed. Among other things, Defendants failed to speak up when witnessing such harassment, failed to create or promulgate any anti-harassment policies, failed to put in place a complaint mechanism or procedure for reporting, investigating, or dealing with harassment, gave no instructions to employees regarding the handling of such complaints, and did not attend any presentations regarding harassment in the workplace.

147. SHAPIRO was harmed by Defendants' failure to take all reasonable steps to prevent harassment.

## TWELFTH CLAIM FOR RELIEF

### Retaliation in Violation of FEHA (Cal. Govt. Code § 12940(h))

(*Against All Defendants*)

148. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

149. At all relevant times, SHAPIRO was an employee of NEW WAVE.

150. NEW WAVE is a California employer subject to FEHA's statutory

THE LAW OFFICES OF
COLLIN SEALS

**COMPLAINT**

requirements.

151. While an employee at NEW WAVE, SHAPIRO became aware of certain actions and/or misrepresentations made by NEW WAVE in documents and communications made available to the public, investors, and/or government entities.

152. SHAPIRO brought the actions and/or misrepresentations to the attention of NEW WAVE, BARNES, and WOLF, because he was concerned continuing with the actions and/or misrepresentations was unethical, potentially illegal, and could subject NEW WAVE to legal repercussions and/or government actions.

153. SHAPIRO expressed these concerns throughout the summer of 2017 and up until the time of his dismissal in September 2017.

154. While an employee at NEW WAVE, SHAPIRO executed a mutual non-disclosure agreement limiting the information about NEW WAVE he could freely disseminate.  SHAPIRO is thus not at liberty to fully disclose NEW WAVE's actions and/or misrepresentations as described herein.

155. Defendant NEW WAVE and Defendants WOLF and BARNES subjected SHAPIRO to a pattern of adverse employment actions throughout his employment at NEW WAVE by, among other things, reducing SHAPIRO's official duties and responsibilities (often while requiring him to unofficially take over BARNES' duties and responsibilities), manipulating his official title at NEW WAVE, and terminating his employment on September 28, 2017.

156. SHAPIRO's advocacy, and his unwillingness to participate in misrepresentations and/or other immoral and/or illegal actions, was a substantial motivating reason for the adverse employment actions taken by NEW WAVE – through BARNES and WOLF – throughout his employment at NEW WAVE.

157. SHAPIRO was harmed by the adverse employment actions taken by NEW WAVE – through BARNES and WOLF – throughout his employment at NEW WAVE. Such harm includes, but is not limited to, the loss of his duties and

responsibilities, the loss of his job and salary, the loss of the salary he deferred in exchange for an additional ownership percentage of NEW WAVE, the loss of all of his ownership stake in NEW WAVE, harm to his professional reputation, and mental anguish.

## THIRTEENTH CLAIM FOR RELIEF

### Wrongful Discharge In Violation of Public Policy

(*Against All Defendants*)

158. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

159. At all relevant times, SHAPIRO was an employee of NEW WAVE.

160. NEW WAVE is a California employer subject to FEHA's statutory requirements.

161. On September 28, 2017, SHAPIRO faced an adverse employment action in the form of a termination of his employment at NEW WAVE, through BARNES and WOLF.

162. SHAPIRO's age, his religion, his sexual orientation, his status as a single father, and his advocacy in encouraging NEW WAVE not to engage in illegal and/or unethical misrepresentations and/or actions, were each a separate substantial motivating reason for his discharge.

163. SHAPIRO's discharge from NEW WAVE – through BARNES and WOLF – caused him harm as described herein.

## FOURTEENTH CLAIM FOR RELIEF

### Fraud

(*Against All Defendants*)

164. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

165. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

THE LAW OFFICES OF
COLLIN SEALS

**COMPLAINT**

166. In June of 2017, BARNES and WOLF approached SHAPIRO with a proposition — if he would defer a substantial portion of his salary, they would allow him to purchase an additional 1% of NEW WAVE shares, bringing his equity stake in NEW WAVE up to 6% once all his shares fully vested.  BARNES and WOLF further promised to refund all salary SHAPIRO deferred, and would do so within a short period of time — most likely by the end of 2017.

167. On information and belief – and as shown by their later actions – BARNES and WOLF never intended to allow SHAPIRO's shares to vest, and never intended to pay back the salary he deferred.

168. SHAPIRO did not know BARNES and WOLF never intended to live up to their promises.  He admired both BARNES and WOLF for their passion and for their ingenuity in creating NEW WAVE's products, and he fully believed NEW WAVE would soon live up to its potential and his 6% equity stake would reap many rewards for him and his son.  BARNES and WOLF knew of SHAPIRO's enthusiasm for NEW WAVE and used it to get him to agree to their proposal.  They intended for him to rely on their promises even though they had no intention of keeping them.

169. And SHAPIRO did agree.  Relying on BARNES' and WOLF's promises, he deferred his salary and signed documents prepared by NEW WAVE's attorneys promising him an increased equity stake.  Then, throughout the summer of 2017 and all the way to his termination in September of 2017, he worked hard to build NEW WAVE's value and position it for the future.

170. However, just prior to his shares beginning to vest, BARNES and WOLF put the remainder of their fraudulent scheme into action.  Acting on behalf of NEW WAVE, they terminated SHAPIRO's employment to deny him any ownership interest in the company.  Further, they refused to pay him the salary he deferred and which they had promised to pay him back.  Instead, they kept both SHAPIRO's shares and his deferred salary for NEW WAVE's and their own benefit.

**COMPLAINT**

171. Thus, as a result of relying on the promises of NEW WAVE, BARNES, and WOLF, SHAPIRO was damaged.

## FIFTEENTH CLAIM FOR RELIEF

### Negligent Misrepresentation

*(Against All Defendants)*

172.  The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

173. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

174. In June of 2017, BARNES and WOLF approached SHAPIRO with a proposition — if he would defer a substantial portion of his salary, they would allow him to purchase an additional 1% of NEW WAVE shares, bringing his equity stake in NEW WAVE up to 6% once all his shares fully vested.  BARNES and WOLF further promised to refund all salary SHAPIRO deferred, and would do so within a short period of time — most likely by the end of 2017.

175. BARNES and WOLF made their promises without any reasonable grounds for believing they or NEW WAVE would fulfill those promises, pay back SHAPIRO's deferred salary, or allow SHAPIRO's shares to vest.

176. BARNES and WOLF – and through them NEW WAVE – intended for SHAPIRO to rely on their misrepresentations.

177. SHAPIRO admired both BARNES and WOLF, and had no reason to doubt their representations.  Therefore, he reasonably relied on their promises and agreed to defer his salary in exchange for an additional equity stake in NEW WAVE.

178. As a result of his reliance on Defendants' misrepresentations, SHAPIRO was harmed as described herein.

## SIXTEENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

(*Against All Defendants*)

179.  The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

180. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

181. When he joined NEW WAVE in November of 2016, SHAPIRO executed a Restricted Stock Purchase Agreement.  Per the terms of this Agreement, SHAPIRO paid $462.99 for shares equaling 5% of NEW WAVE.  He thus became a shareholder of NEW WAVE although his shares would only fully vest beginning in November of 2017, pursuant to the vesting schedule set forth in the Agreement.

182. In June of 2017, BARNES and WOLF approached SHAPIRO with a proposition — if he would defer a substantial portion of his salary, they would allow him to purchase an additional 1% of NEW WAVE shares, bringing his equity stake in NEW WAVE up to 6% once all his shares fully vested.  BARNES and WOLF further promised to refund all salary SHAPIRO deferred, and would do so within a short period of time — most likely by the end of 2017.

183. By executing the Restricted Stock Purchase Agreement, and by accepting BARNES' and WOLF's proposal in June 2017, NEW WAVE, BARNES, and WOLF entered into a fiduciary relationship with SHAPIRO, and owed him fiduciary duties as a shareholder, and as an employee deferring his salary at the company's request in order to secure a further equity stake in the company. Defendants were obligated to act with the utmost loyalty towards SHAPIRO and treat his interests in NEW WAVE with the utmost care.

184. BARNES, WOLF, and NEW WAVE failed to act in SHAPIRO's best interests and failed to treat his interest in NEW WAVE with the utmost care. Among other things, BARNES and WOLF failed in their duties as officers of NEW

- 32 -

WAVE to seek and secure available investor funds to increase NEW WAVE's production and its market reach; and – with NEW WAVE – induced SHAPIRO to defer salary in exchange for an additional 1% of NEW WAVE they and NEW WAVE never intended to allow to vest; and – with NEW WAVE – terminated SHAPIRO's employment just a few short weeks before his shares were due to begin fully vesting.

185. BARNES', WOLF's, and NEW WAVE's breaches of their fiduciary duties towards SHAPIRO were fraudulent, willful and malicious.

186.   As a result of BARNES', WOLF's, and NEW WAVES breaches of their fiduciary duties, SHAPIRO was harmed as described herein.

## SEVENTEENTH CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

*(Against All Defendants)*

187.  The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

188. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

189. When he joined NEW WAVE in November of 2016, SHAPIRO executed a Restricted Stock Purchase Agreement.  Per the terms of this Agreement, SHAPIRO paid $462.99 for shares equaling 5% of NEW WAVE.  He thus became a shareholder of NEW WAVE although his shares would only fully vest beginning in November of 2017, pursuant to the vesting schedule set forth in the Agreement.

190. In June of 2017, BARNES and WOLF approached SHAPIRO with a proposition — if he would defer a substantial portion of his salary, they would allow him to purchase an additional 1% of NEW WAVE shares, bringing his equity stake in NEW WAVE up to 6% once all his shares fully vested.  BARNES and WOLF further promised to refund all salary SHAPIRO deferred, and would do so within a short period of time — most likely by the end of 2017.

THE LAW OFFICES OF
COLLIN SEALS

191. Implied in both contracts described above was a covenant of good faith and fair dealing, binding on BARNES, WOLF, and NEW WAVE.

192. SHAPIRO, for his part, substantially performed all the duties required of him by the terms of both contracts, such that he would be entitled to his fully vested shares beginning in November of 2017, and would be entitled to repayment of his deferred salary.

193. BARNES, WOLF, and NEW WAVE never intended to allow SHAPIRO's shares to vest even though SHAPIRO substantially performed all the duties required of him by the terms of both contracts.  Instead of allowing SHAPIRO's shares to begin vesting, NEW WAVE, BARNES, and WOLF concocted a false reason to terminate SHAPIRO's employment on September 28, 2017.  In terminating SHAPIRO, Defendants did not even pay him back his deferred salary.

194. BARNES', WOLF's, and NEW WAVE's breaches of the covenant of good faith and fair dealing were fraudulent, willful and malicious, and SHAPIRO was harmed as described herein.

## EIGHTEENTH CAUSE OF ACTION

### Money Had and Received

(*Against All Defendants*)

195. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

196. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

197. As also set forth above, Defendants – and each of them – breached their fiduciary duties and the covenant of good faith and fair dealing, terminating SHAPIRO's employment at NEW WAVE without just cause on September 28, 2017.

198. In doing so, Defendants appropriated and kept for themselves and for their own purposes the 6% of NEW WAVE stock SHAPIRO had properly purchased per

THE LAW OFFICES OF
COLLIN SEALS

**COMPLAINT**

both the Restricted Stock Purchase Agreement and the later agreement in June of 2017. Defendants also kept and appropriated for their own purposes the funds due to SHAPIRO in the form of the salary he deferred in order to secure an additional 1% equity stake in NEW WAVE in June 2017.

199. Defendants have thus withheld funds intended for SHAPIRO's benefit but which were not used for SHAPIRO's benefit. Instead, they are used for Defendants' benefit to this day.

## NINTEENTH CAUSE OF ACTION

### Constructive Trust (Civil Code §§ 2223, 2224)

(*Against All Defendants*)

200. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

201. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

202. As also set forth above, Defendants – and each of them – took SHAPIRO's money and/or property by means of fraud, deceit, undue influence, violation of trust, violation of the covenant of good faith and fair dealing, and violation of fiduciary duty. In particular, Defendants coerced and defrauded SHAPIRO into agreeing to defer a portion of his salary for what was supposed to be a short period of time, after which he would be paid back the deferred portion. Defendants then terminated SHAPIRO's employment after he deferred that salary for several months, but did not refund the deferred portion at the time of his dismissal nor at any time afterwards.

203. Thus, Defendants – and each of them – wrongfully detained money due and owing to SHAPIRO, and still retain that money to the present day.

204. Defendants have therefore created a constructive trust, and hold these funds in trust for SHAPIRO.

## TWENTIETH CLAIM FOR RELIEF

**Injunctive Relief – Incorrect Wage Statements (California Labor Code § 226)**

(*Against Defendant NEW WAVE*)

205. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

206. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

207. NEW WAVE is a California employer and subject to the requirements of the California Labor Code.

208. Labor Code § 226(a) requires NEW WAVE to provide SHAPIRO with an "accurate itemized statement in writing" showing, among other things: gross wages earned; total hours worked; all deductions from the paycheck; and net wages earned.  Pursuant to subsection (j), the employer is not required to show the total hours worked by the employee if he or she is exempt.  Further, pursuant to subsections (b) and (c), the employer must provide copies of these "accurate" records to a current or former employee upon demand, within 21 days.

209. SHAPIRO made a demand for the records required to be kept pursuant to Labor Code § 226, and pursuant to this request, NEW WAVE provided records of SHAPIRO's paychecks.

210. The records provided by NEW WAVE are not "accurate."  For example, the records provided identify SHAPIRO as an employee working more than 40 hours per week — an amount which would entitle SHAPIRO to significant overtime, which NEW WAVE never paid, whether during SHAPIRO's tenure with the company or upon his termination.

211. Because of these inaccuracies and others, SHAPIRO is deemed to suffer injury, because – among other things – he "cannot promptly and easily determine from the wage statement alone," and "without reference to other documents" whether he is entitled to overtime for working more than 40 hours per week.  Labor

- 36 -

**COMPLAINT**

Code § 226(e)(2)(B)-(C).  Shapiro is therefore entitled to injunctive relief as well as statutory penalties, costs, and reasonable attorneys' fees.

## TWENTY-FIRST CLAIM FOR RELIEF

### Nonpayment of Wages (California Labor Code §§ 201, 218)

*(Against All Defendants)*

212. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

213. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

214. NEW WAVE is a California employer and subject to the requirements of the California Labor Code.

215. NEW WAVE terminated SHAPIRO's employment on September 28, 2017.

216. When NEW WAVE terminated SHAPIRO's employment, it was obligated to pay him all monies due and owing to him at the time of his dismissal.

217. NEW WAVE did not pay SHAPIRO all monies due and owing to him at the time of his dismissal.  At a minimum, NEW WAVE withheld the salary SHAPIRO had deferred and which NEW WAVE had promised to pay back as a condition of SHAPIRO's agreement to grant a deferral of his salary.  SHAPIRO is informed and believes and on that basis alleges that the amount of salary withheld from SHAPIRO pursuant to this calculation – and which was due and owing to him at the time of his dismissal – is $26,666.72

218. NEW WAVE also withheld money due and owing to SHAPIRO for his unused vacation time. SHAPIRO is informed and believes and on that basis alleges that the amount of unused vacation time due and owing to him at the time of his dismissal is $11,093.76.

## <u>TWENTY-SECOND CLAIM FOR RELIEF</u>

### Waiting Time Penalty (California Labor Code §§ 203, 218)

(*Against All Defendants*)

219. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

220. As set forth above, at all relevant times SHAPIRO was an employee of NEW WAVE.

221. NEW WAVE is a California employer and subject to the requirements of the California Labor Code.

222. NEW WAVE terminated SHAPIRO's employment on September 28, 2017.

223. When NEW WAVE terminated SHAPIRO's employment, it was obligated to pay him all monies due and owing to him at the time of his dismissal.

224. NEW WAVE did not pay SHAPIRO all monies due and owing to him at the time of his dismissal. At a minimum, NEW WAVE withheld the salary SHAPIRO had deferred and his accrued but unused vacation time, amounting to more than $35,000.

225. NEW WAVE never paid SHAPIRO all monies due and owing to him.

226. NEW WAVE's decision to withhold the money due and owing to SHAPIRO was willful.

227. SHAPIRO is entitled to 30 days pay. SHAPIRO's salary absent the deferral, was $160,000 per year, or $438.36 each calendar day. SHAPIRO is thus entitled to $13,150.68 in addition to all other relief.

# V.   PRAYER FOR RELIEF

WHEREFORE Plaintiff ALEXANDER SHAPIRO prays for relief as follows:

1.   For payment of all monies due and owing, including but not limited to $26,666.72 in deferred salary and $11,093.76 in accrued and unused vacation time, and all other compensation due and owing to SHAPIRO at the time of his dismissal, according to proof;

2.   For payment of thirty days additional wages pursuant to California Labor Code § 203;

3.   For 6% of NEW WAVE pursuant to his agreements with NEW WAVE;

4.   For other compensatory damages according to proof;

5.   For prejudgment interest on all compensatory damages including unpaid wages and other sums due and owing;

6.   For statutory penalties as applicable;

7.   For punitive damages;

8.   For attorneys' fees and costs of suit; and

9.   For such other relief as this court deems just and equitable.


Dated: September 21, 2018          **THE LAW OFFICES OF COLLIN SEALS**


By: *s/Collin Seals*
_____

COLLIN SEALS
Attorney for Plaintiff
ALEXANDER SHAPIRO

**COMPLAINT**

# **DEMAND FOR JURY TRIAL**

Plaintiff ALEXANDER SHAPIRO hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: September 21, 2018

**THE LAW OFFICES OF COLLIN SEALS**

By: *s/Collin Seals*
_____

COLLIN SEALS
Attorney for Plaintiff
ALEXANDER SHAPIRO

**COMPLAINT**